IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | | |
|---|---|---|
| JAMES W. MORGAN, | : | Case No. 1:21-cv-481 |
| Plaintiff, | : | Judge Matthew W. McFarland |
| v. | : | |
| INTERSTATE RESOURCES, INC., | : | |
| Defendant. | : | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. 45)

This matter is before the Court on Defendant Interstate Resources, Inc. ("IRI")'s Motion for Summary Judgment (Doc. 45). Plaintiff James W. Morgan filed a Memorandum in Opposition to the motion (Doc. 53), to which Interstate filed a Reply in Support (Doc. 54). Thus, this matter is ripe for the Court's review. For the reasons below, IRI's Motion for Summary Judgment (Doc. 45) is **GRANTED**.[1]

## FACTS

Morgan, an American citizen born in 1958, entered into an Employment Agreement with IRI in 2006 to be the company's Executive Vice President. (Employment Agreement, Doc. 1-2, Pg. ID 12-23; Compl., Doc. 1, ¶ 9.) The Employment Agreement states that it will "be executed, construed and performed in accordance with the laws of

---

[1] The parties request oral arguments on IRI's motion for summary judgment. (*See* Motion for Summary Judgment, Doc. 45, Pg. ID 4014; Response in Opp., Doc. 53, Pg. ID 4224.) The undersigned finds that oral arguments are not "essential to the fair resolution of the" motion before the Court. *See* S.D. Ohio Civ. R. 7.1(b)(2). Accordingly, the parties' request is denied.

the Commonwealth of Virginia." (Employment Agreement, Doc. 1-2, Pg. ID 23.)

In August 2017, DS Smith PLC acquired IRI and assumed Morgan's Employment Agreement. (Compl., Doc. 1, ¶ 14; Morgan Dep., Doc. 27, Pg. ID 716; Offer Letter, Doc. 27-1, Pg. ID 1054-59.) At the time of the acquisition, DS Smith's Group Chief Executive, Miles Roberts, chose Morgan to become the Managing Director of the North American branch of the company. (*Id.*)

## I. Benefits of Morgan's New Role

The Managing Director position included eligibility in a Deferred Share Bonus Plan ("DSBP") and a Performance Share Plan ("PSP"). (Offer Letter, Doc. 27-1, Pg. ID 1054-59.) These plans allocate certain awards that would become available to Morgan if he remained with the company for at least three years after accepting the Managing Director position. (*Id.*) If Morgan left the company before the three-year requirement was met, those awards could still become available if he were deemed a "Good Leaver." (DSBP, Doc. 27-1, Pg. ID 1091.)

An employee could be considered a Good Leaver for various reasons, including through "retirement with the agreement of his employer and the [Remuneration] Committee" or for "any other reason, if the [Remuneration] Committee so decides." (DSBP, Doc. 27-1, Pg. ID 1091.) If an employee was terminated for under-performance, the Remuneration Committee was not required to deem the employee a Good Leaver. (Termination Guidance, Doc. 27-11, Pg. ID 1144.)

In October 2017, Morgan agreed to a change-in-control amendment to his Employment Agreement. (Amendment, Doc. 27-1, Pg. ID 1052.) This amendment stated

2

that, in the event of a change in control of the company, Morgan could be eligible for a severance payment if he (1) continued to work for the new owners for three months, if requested by the new owners, and (2) voluntarily terminated his employment by August 25, 2019. (*Id.*)

II. **Morgan's Performance as Managing Director**

As the Managing Director, Morgan acted as the head manager of the company's North American Packing and Paper ("NAPP") business. (Morgan Dep., Doc. 27, Pg. ID 716, 725, 775-76.) As a part of this position, Morgan helped create annual and monthly financial forecasts for NAPP. (*Id.* at Pg. ID 851-54.) In 2017 and 2018, NAAP met its forecasts as predicted. (*Id.*) In 2019, however, NAPP began falling short. (*See* Financial Performance Email, Doc. 27-1, Pg. ID 1165-66.)

At the beginning of 2019, NAPP was about $3.5 million below its forecasted performance level. (Financial Performance Email, Doc. 27-1, Pg. ID 1165-66.) By April 2019, Roberts notified Morgan that he saw "a drop on over [$4 million] in the month," which was "a problem." (Roberts' Text, Doc. 44-1, Pg. ID 3968.) In June 2019, NAPP missed its forecast by $1.3 million. (Summer Email Correspondence, Doc. 27-1, Pg. ID 1170.) By July 2019, NAPP's forecast for earnings before interest, taxes, and amortization ("EBTA") had declined by $6.5 million. (*Id.*)

Still, the company as a whole continued to perform well. And, on July 2, 2019, Roberts awarded Morgan a bonus for the company's 2018/2019 performance. (Bonus Letter, Doc. 27-1, Pg. ID 1061.) In the bonus letter, Roberts noted the "significant year of progress" in the company's business. (*Id.*) Additionally, Roberts noted that "[t]he North

3

American business [] acquired in 2017 continue[d] to perform well." (*Id.*)

On July 18, 2019, Morgan informed Roberts that he was considering retirement and had concerns about his eligibility for the DSBP and PSP awards, as well as the change-in-control severance payment. (Morgan Dep., Doc. 27, Pg. ID 729-30.) In response, Roberts allegedly told Morgan that he had nothing to be concerned about, that Morgan "was in their plans for the future," that "they were happy with what was going on," and that Morgan should have "no concerns about a change in control." (*Id.* at Pg. ID 731.) Roberts denies ever making such statements. (Roberts Dep., Doc. 35, Pg. ID 2364.)

NAPP continually failed to meet its objectives for the 2018/2019 fiscal year, which Morgan discussed in an email sent out to NAPP employees at the end of July. (Performance Email, Doc. 27-1, Pg. ID 1168-69.) The email stated that "[w]hile there were many individual and team successes, the overall outcome fell short of Budget and most of our established targets." (*Id.* at 1168.) Most notably, Morgan touched on the fact that (1) "NAPP had a miss on EBITA (92.7% of Budget), which put the division below the 95% threshold," (2) "[p]ackaging had a material miss on EBITA (42.2% of budget), which was far below the 95% threshold," (3) "Mill Productivity was 92.7% of Budget, while our ROACE was below the 95% threshold at 91.4% and 89%," and (4) "[p]acking delivery in FY 18/19 was consistency below budget throughout the year." (*Id.*) The email noted some success in NAPP, such as the "short paper position" which offset decline. (*Id.* at Pg. ID 1169.)

Morgan maintains that the market caused NAPP's decline. (Morgan Dep., Doc. 27, Pg. ID 868-87.) In Morgan's estimation, decreasing paper prices, coupled with the U.S.

4

trade war with China, created the perfect storm for a troubled market. (*Id.*) Morgan also maintains that the European branch of the company continued to "move paper into the U.S. but would not take any back," meaning that NAPP was left with large amounts of paper with no one to sell it to. (*Id.* at Pg. ID 868.) Roberts agreed that, to some extent, the market affected NAPP's financial position. (Roberts Dep., Doc. 35, Pg. ID 2444-45.) But Roberts also found that Morgan's management style had some impact on NAPP's performance. (*Id.*)

So, at the end of July, Roberts sent one of the company's packaging managers, Thomas Jakobsen, to NAPP to act as an internal consultant. (Jakobsen Dep., Doc. 36, Pg. ID 2611-12; 2620-22; Jakobsen Role Correspondence, Doc. 36-1 at Page ID 2751-53.) Jakobsen was born in Denmark in 1969. (Jakobsen Dep., Doc. 36, Pg. ID 2556-57.) Previously, in May 2019, Roberts had discussions with Jakobsen about a more long-term role with NAPP, but Jakobsen found that a temporary consulting position aligned more with his family situation. (Jakobsen Role Correspondence, Doc. 36-1 at Page ID 2751-53.)

On a previous occasion, Roberts had communicated his plans for the future of NAPP to Jakobsen. (*See* Organization Chart, Doc. 41, Pg. ID 3588-89.) On May 10, 2019, Roberts emailed two hand-drawn charts of NAPP's organizational structure to Jakobsen. (*Id.*) In the "current" chart, Roberts laid out NAPP's management structure as a pyramid, with Morgan at the top as "MD." (*Id.* at Pg. ID 3589.) In the "future" chart, Roberts divided out NAPP's top management, separating out the "MD" role into two positions for a "Managing Director of Paper" and a "Managing Director of Packaging." (*Id.*) Roberts made no more specific identifications for those roles. (*Id.*)

5

While consulting, Jakobsen observed a number of problems with NAPP. These problems included "a complete lack of NAPP strategy and direction," "little real buy-in to DSS strategy [] – words but no real action," "no structure and processes to drive improvement in any function," and "huge capability issues in top management." (Jakobsen Dep., Doc. 36, Pg. ID 2611-12, 2620-22, 2647; Jakobsen Notes, Doc. 36-1, Pg. ID 2776-77.) Jakobsen concluded that the "clear underlying problem" was "top management." (*Id.*) These observations were expanded upon in an official report released that September. (Analysis Report, Doc. 36-1, Pg. ID 2778-822.)

On August 20, 2019, Jakobsen expressed his concerns to Roberts, who "was not surprised." (Jakobsen Text, Doc. 35-1, Pg. ID 2540.) Roberts found that NAPP's performance had "significantly deteriorated" and specifically communicated to Morgan that "the [NAPP's packaging] results were very poor." (Roberts Dep., Doc. 35, Pg. ID 2443; July 27, 2019 Email, Doc. 27-1, Pg. ID 1172-73.) Roberts inquired with Morgan whether there was any sort of correction plan to remedy NAPP's financial downfall. (Roberts Dep., Doc. 35, Pg. ID 2442-44.) After repeated inquiries, Roberts found that Morgan had "no clear action plan." (*Id.*) Though, other employees maintain that NAPP had "detailed plans on how to improve." (Nelson Dep., Doc. 32, Pg. ID 2004.)

In August, discussions of Morgan's termination began. On August 28, 2019, Roberts emailed the legal department about terminating Morgan. (Roberts Dep., Doc. 35, Pg. ID 2414.) Around this time, another supervisor informed NAPP's Chief Financial Officer, Kevin Ledbetter, that Morgan would soon be let go. (Ledbetter Dep., Doc. 31, Pg. ID 1854-55.) And, on October 6, 2019, Roberts officially terminated Morgan for his role in

6

NAPP's poor performance. (Roberts Dep., Doc. 35, Pg. ID 2332, 2416-17.)

Morgan maintains that he was blindsided by his termination. (Morgan Dep., Doc. 27, Pg. ID 829-30, 861-62.) Before he was terminated, Morgan maintains that he never spoke with Roberts about his performance and Roberts never gave any other indication that Morgan was "in trouble." (*Id.*) Roberts maintains that he had several conversations with Morgan about NAPP's "unacceptable" performance. (Roberts Dep., Doc. 35, Pg. ID 2331.)

Other American employees over the age of 60 were also being terminated around this time. (Morgan Dep., Doc. 27, Pg. ID 725-937.) Among these employees included Susan Newman from human resources, John Cristo, a regional general manager, and Al Cantrell, a managing director of paper. (*Id.*)

Following Morgan's termination, the company appointed Ledbetter as the interim Managing Director of NAPP. (Appointment Email, Doc. 27-1, Pg. ID 1182-83.) In the meantime, the company looked for possible replacements for the position. (*Id.*; Roberts Dep., Doc. 35, Pg. ID 2327, 2419-20.) Roberts specifically had discussions with Jakobsen about taking the role, but Jakobsen was not interested. (Roberts Dep., Doc. 35, Page ID 2391-98; 2456; Denial of Offer Email, Doc. 35-1, Page ID 2517-19.) Jakobsen understood these discussions to be an offer for the Managing Director position, though Roberts maintains these were merely conversations. (*Id.*) Ledbetter was later terminated with Good Leaver status in 2022 and was replaced by American Jeff Jones, born in 1966. (Ledbetter Dep., Doc. 42, Pg. ID 3738, 3770-71.)

## LAW & ANALYSIS

### I. Requests for Judicial Notice

Before turning to IRI's motion for summary judgment, the Court will first address the parties' requests for judicial notice of certain facts.

Under Federal Rule of Evidence 201, the Court "may judicially notice a fact that is not subject to reasonable dispute because it" is either "generally known within the trial court's jurisdiction" or it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). But "[a] fact is not the proper subject of judicial notice if the notice is sought for a purpose that is 'not relevant or necessary to resolve [the] action.'" *Jones v. Prudential Sec., Inc.*, 534 F. Supp. 3d 839, 841 (E.D. Mich. 2021) (quoting *Cece v. Wayne Cnty.*, 758 F. App'x 418, 425 (6th Cir. 2018)). Ultimately, if a party requests judicial notice "and the court is supplied with the necessary information," then the court "must take judicial notice." Fed. R. Evid. 201(c)(2).

First, IRI asks this Court to take judicial notice of (1) "IRI's Annual Reports filed with the Virginia Secretary of State from 2007 through 2019," (2) "[d]ocuments produced by the U.S. Equal Employment Opportunity Commission concerning [] Morgan's charge of discrimination," and (3) "[e]xcerpts of pages from DS Smith [PLC's] 2010 Annual Report." (IRI's Judicial Notice Request, Doc. 45-3, Pg. ID 4011.) IRI has supplied supporting documents for each request (*See* Hill Aff., Doc. 44), and Morgan does not oppose IRI's request. (*See* Response in Opp., Doc. 53.) Accordingly, the Court finds it appropriate to take judicial notice of these facts and grants IRI's Request (Doc. 45-3).

Next, Morgan requests that this Court take judicial notice of *Lienbenberg v. DS*

8

*Smith Packaging LTD., et al.*, No. 220786/2019, Judgment, (Employment Tribunal June 29, 2020), a judicial decision rendered by the United Kingdom's Employment Tribunal in the England and Wales jurisdiction. (Morgan's Judicial Notice Request, Doc. 51.) This case centers on a claim filed by a former DS Smith PLC employee. (*See id.*) Morgan requests judicial notice of this case because it cites statements made by Roberts and another employee that are "directly relevant to the issues in Morgan's case." (Plaintiff's Reply to Defendant's Objections, Doc. 57.) But these allegedly "relevant" facts only pertain to behavioral issues of Jakobsen and his ultimate dismissal as a Good Leaver. (*See* Plaintiff's Statement of Facts, Doc. 53-1.) As demonstrated below, these facts are "not relevant or necessary to resolve [this] action.'" *Cece*, 758 F. App'x at 425. Moreover, Morgan has not provided the Court with any "necessary information" that would mandate this Court to take judicial notice of the facts in that case. *See* Fed. R. Evid. 201(b). Accordingly, the Court will not take judicial notice of *Lienbenberg v. DS Smith Packaging LTD., et al.*, No. 220786/2019, Judgment, (Employment Tribunal June 29, 2020). Morgan's Request (Doc. 51) is denied.

## II. Motion for Summary Judgment

The Court now turns to IRI's Motion for Summary Judgment (Doc. 45). When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the district court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes

the nonmoving party's responsibility to point to specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A court is under no obligation to search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). And a "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy*, 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Morgan brings claims against IRI for: (1) national origin discrimination in violation of Title VII, (2) national origin discrimination in violation of Ohio Revised Code § 4112, (3) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), (4) negligent/intentional misrepresentation, and (5) fraudulent inducement. (Compl., Doc. 1, ¶¶ 28-54.) IRI moves for summary judgment on all claims brought against it. (Motion for Summary Judgment, Doc. 45.) The Court will take each in turn.

**1) Federal Age and National Origin Discrimination Claims**

Morgan brings claims against IRI for national origin discrimination under Title VII and age discrimination under the ADEA. (Compl., Doc. 1, ¶¶ 28-32, 38-43). These discrimination claims are both analyzed under the same framework, so the Court will review them in tandem. *See Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 283 (6th Cir. 2012)

(addressing age discrimination standard); *Khamati v. Sec'y of the Dep't of the Treasury*, 557 F. App'x. 343, 438 (6th Cir. 2014) (addressing national origin discrimination standard).

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1). And the ADEA prohibits an employer from discriminating against an employee "because of such individual's age." 29 U.S.C. § 623(a)(1). Where, as here, a plaintiff seeks to establish discrimination through indirect, rather than direct, evidence, the Court applies the *McDonnell Douglas* burden-shifting framework. *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010).

The first step of this framework requires a plaintiff to establish a prima facie case for discrimination. *Younis*, 610 F.3d at 363. To establish a prima facie case, a plaintiff must show that he was: (1) a member of a protected class, (2) qualified for the position, (3) the victim of an adverse employment action, and (4) replaced by someone outside the protected class. *See Ang v. Procter & Gamble Co.*, 932 F.2d 540, 548 (6th Cir. 1991). Once the plaintiff establishes his prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 548. If the defendant meets its burden, the burden shifts back to the plaintiff to demonstrate that the defendant's reason was but a pretext for unlawful discrimination. *Id.*; *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

The Court proceeds on the assumption that Morgan has proven his prima facie case. IRI too satisfies its burden of showing that it terminated Morgan for a legitimate,

11

nondiscriminatory reason: Morgan's management had a negative impact on NAPP's performance. (*See* Motion for Summary Judgment, Doc. 3985-86.) Poor performance is a legitimate and nondiscriminatory reason for terminating an employee. *Hussain v. Highgate Hotels, Inc.*, 126 F. App'x. 256, 265 (6th Cir. 2005) (citation omitted). The burden thus shifts back to Morgan to show that this reason is pretextual.

The fundamental question in the pretext analysis is: did the employer make the adverse employment decision for the stated reason or not? *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012). A plaintiff must produce sufficient evidence such that a reasonable jury could doubt the employer's stated reason for its actions. *McCart v. Univ. of Cincinnati Found.*, No. 1:08-cv-656, 2010 U.S. Dist. LEXIS 34406, at *7 (S.D. Ohio Apr. 7, 2010). Plaintiffs may refute an employer's proffered legitimate reason by showing that the reason (1) has no basis in fact, (2) did not actually motivate the challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003).

Morgan first argues that IRI's reasoning was pretextual because outside market forces caused NAPP's poor performance, not Morgan's management. (Response in Opp., Doc. 53, Pg. ID 4238-39.) But Morgan does not point to any evidence, other than his own testimony, to show that market forces were the sole cause of NAPP's poor performance. (*See id.*) In fact, Jakobsen observed and reported that "top management" had a large role in NAPP's financial failings. (Jakobsen Dep., Doc. 36, Pg. ID 2611-12, 2620-22; Jakobsen Notes, Doc. 36-1, Pg. ID 2776-77; Analysis Report, Doc. 36-1, Pg. ID 2778-22.) IRI understood, then, that Morgan's management had some role in NAPP's poor

12

performance. (*See* Roberts Dep., Doc. 35, Pg. ID 2332, 2416-17.) IRI terminated Morgan accordingly. This decision to terminate Morgan for what IRI believed to be the cause of NAPP's poor performance does not constitute pretext, even if Morgan's management ultimately was not the actual cause. *See Seeger v. Cincinnati Bell Tel. Co., LLC.*, 681 F.3d 274, 285-86 (6th Cir. 2012) (As long as the employer held an honest belief in its proffered reason, "the employee cannot establish pretext even if the employer's reason is ultimately found to be mistaken, foolish, trivial, or baseless."). Accordingly, Morgan's first argument fails.

Morgan next argues that IRI's proffered reason was pretextual because IRI actually terminated Morgan to replace him with Jakobsen. (Response in Opp., Doc. 53, Pg. ID 4238-39.) In support of this argument, Morgan points to Roberts' conversations with Jakobsen about finding him a long-term role with NAPP, as well as Roberts' discussions with Jakobsen about taking the role of Managing Director after Morgan was terminated. (*See id.*) But these conversations do not definitively show that the real reason for Morgan's termination was to fill the position with Jakobsen. And in any event, this type of evidence, while relevant to establishing a prima facie case of discrimination, is usually not enough to overcome pretext. *Arnold v. Cincinnati Sportservice, Inc.*, No. 1:12-cv-460, 2013 U.S. Dist. LEXIS 99011, at *26-27 (S.D. Ohio July 16, 2013) ("[Plaintiff] notes that the position was offered to substantially younger women on two separate occasions, but . . . this is not enough to establish pretext.").

Finally, Morgan argues that IRI's proffered reason was pretextual based on the termination of other older American employees who were fired around the same time as

13

Morgan. (Response in Opp., Doc. 53, Pg. ID 4238-39.) But this argument also fails to show pretext. The only evidence offered on these terminations comes directly from Morgan. (*See* Morgan Dep., Doc. 27, Pg. ID Pg. ID 725-937.) Morgan provides only the names and occupations of these employees; he provides no other relevant information on their terminations. (*Id.*) Without more, the Court has no way of relating these terminations to Morgan's. *See Sprint/United Mgmt. Co. v. Medelsohn*, 552 U.S. 379, 388 (2008) (Nothing that the relevancy of this sort of evidence "is fact based and depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case."). Moreover, courts in this circuit hesitate to rely on this sort of "me too" evidence to show pretext. *See Megivern v. Glacier Hills Inc.*, No. 11-10026, 2012 U.S. Dist. LEXIS 20749, at *58-59 (E.D. Mich. Feb. 17, 2012) (collecting cases).

Morgan failed to overcome his burden to show that IRI's proffered reason for terminating Morgan was pretextual. Accordingly, summary judgment must be entered in favor of IRI on Morgan's federal discrimination claims.

### III. Ohio National Origin Discrimination

The Court now turns to Morgan's national origin discrimination claim brought under Ohio Revised Code § 4112. (*See* Compl., Doc. 1, ¶¶ 33-37.) IRI moves for summary judgment on this claim, arguing that it should have been brought under Virginia law—under the Employment Agreement's choice-of-law provision—and that Virginia has no parallel law to enforce against IRI. (Motion for Summary Judgment, Doc. 45, Pg. ID 3990.) Morgan does not oppose this argument in his response. (*See* Response in Opp., Doc. 53.) This failure alone entitles IRI to summary judgment on this claim. *Brown v. VHS of*

14

*Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). But even if this claim was properly brought under Ohio law, it would still fail under the framework applied above. *See Vechvitvarakul v. Health All. Of Greater Cincinnati*, No. 1:10-cv-114, 2012 U.S. Dist. LEXIS 17674, at *24 (S.D. Ohio Feb. 13, 2012) (applying *McDonell Douglas* framework to Ohio national origin discrimination claim). Accordingly, summary judgment must be entered in favor of IRI on Morgan's Ohio national origin discrimination claim.

## IV. Negligent/Intentional Misrepresentation and Fraudulent Inducement Claims

Next, the Court turns its attention to Morgan's remaining claims for negligent/intentional misrepresentation and fraudulent inducement. (*See* Compl., Doc. 1, ¶¶ 44-54.) IRI moves for summary judgment on these claims, arguing that they fail under the economic loss rule and because Morgan has not shown any misrepresentations by IRI. (Motion for Summary Judgment, Doc. 45, Pg. ID 3990-92.)

Before the Court can consider the substance of these claims, it must first address which state's law applies. The Employment Agreement states that it will "be executed, construed and performed in accordance with the laws of the Commonwealth of Virginia." (Employment Agreement, Doc. 1-2, Pg. ID 23.) IRI maintains that Morgan's negligent/intentional misrepresentation and fraudulent inducement claims are subject to this choice-of-law provision because they relate to Morgan's contractual rights under the Employment Agreement. (Motion for Summary Judgment, Doc. 45, Pg. ID 3989-90.)

15

Morgan does not contest this assertion. (*See* Response in Opp, Doc. 53.) And, to be sure, the Sixth Circuit has extended the scope of choice-of-law provisions with similar language to tort claims when they relate to performance of an agreement. *See Baumgardner v. Bimbo Food Bakeries Distrib., Inc.*, 697 F. Supp. 2d 801, 804-06 (N.D. Ohio 2010) (collecting cases). Accordingly, the Court will apply Virginia law to these claims.

IRI first argues that Morgan's negligent/intentional misrepresentation and fraudulent inducement claims fail under the economic loss rule. The economic loss rule provides that a person may not recover damages for a tort where the damages are purely economic losses rather than physical injury to a person or property. *See Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 374 S.E.2d 55, 57 (Va. 1988). The economic loss rule is closely tied to the independent duty rule, which states that "in order to recover in tort, the duty tortiously breached must be a common law duty, not one existing between the parties solely by virtue of the contract." *Tingler v. Graystone Hopmes, Inc.*, 834 S.E.2d 244, 255, 264-65 (Va. 2019).

> These rules are based on policy considerations underlying contract and tort law:
>
> The law of torts is well equipped to offer redress for losses suffered by reason of a breach of some duty imposed by law to protect the broad interests of social policy. Tort law is not designed, however, to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts.

*Sensenbrenner*, 374 S.E.2d at 58 (citation omitted). Thus, when a plaintiff alleges economic losses suffered from disappointed bargained-for expectations "assumed only by agreement, the law of contracts, not the law of torts, provides the remedy for such

16

economic losses." *Filak v. George*, 594 S.E.2d 610, 613 (Va. 2004).

"[T]o determine whether a claim is subject to the restrictions imposed by the economic loss rule, a court must first determine the nature and source of the duty allegedly violated." *Lynnwood Tech Holdings LLC v. NR Int. LLC*, No. 2015-15954, 2017 Va. Cir. LEXIS 52, at *14 (Va. Cir. Ct. Feb. 24, 201) (citation omitted). "If the duty does not exist absent an agreement establishing that duty, then it is a duty based in contract, and the economic loss rule applies." *Id*.

The economic loss rule does not apply to Morgan's negligent/intentional misrepresentation and fraudulent inducement claims because they do not implicate a duty arising out of the Employment Agreement. These claims center on the July 18, 2019 conversation between Roberts and Morgan, wherein Roberts seemingly encouraged Morgan not to retire through allegedly misleading statements. (Response in Opp., Doc. 53, Pg. ID 241-44.) IRI maintains that the duty breached by Roberts under these claims relate to the Employment Agreement. (Motion for Summary Judgment, Doc. 45, Pg. ID 3990-92.) But IRI does not point to any provision in the Employment Agreement that would require Roberts to discuss retirement or job prospects in a particular way to Morgan. (*See id*.) To be sure, "the duty not to mislead others to their detriment arises from common law," not the Employment Agreement. *Fenner BL, LLC v. Fenner Garden Partners, LLC*, No. CL17-13859, 2018 Va. Cir. LEXIS 709, at *8 (Cir. Ct. 2018); *Cf. Richmond Metro. Auth. v. McDevitt St. Bovis*, 507 S.E.2d 344, 347 (Va. 1998) (Because "each particular misrepresentation by [the contractor] related to a duty or an obligation that was specifically required by the [c]ontract," the court concluded that the contractor's

17

misrepresentations did not "give rise to a cause of action for actual fraud.").

Further, these claims allege damages that are not solely economic. Morgan alleges that, as a result of his reliance on Roberts' misrepresentations, he suffered damages in the form of a loss of employee benefits and reputation, as well as mental anguish. (Response in Opp., Doc. 56, Pg. ID 4244.) Morgan also seeks punitive damages. (*Id.*) While some of these losses stem from the Employment Agreement, they are not all purely economic. Accordingly, the economic loss rule does not apply.

The Court now turns to the substance of these claims. A central element to both claims is the requirement for clear and convincing evidence of a false representation. *Hansen v. Stanley Marin Cos.*, 585 S.E.2d 567, 573 (Va. 2003) (Virginia courts consider fraud and misrepresentation claims together because both counts "sound in fraud."); *Cromer v. Molden Real Est. Corp.*, No. 84-L-100, 1991 Va. Cir. LEXIS 187, at *6 (Va. Cir. Ct. Sept. 26, 1991) (both actual and constructive fraud require a showing of a misrepresentation); *Chlanda v. Hiller*, No. 21-3865, 2022 Va. Cir. LEXIS 348, at *8 (Va. Cir. Ct. June 3, 2022) (the elements of a claim for fraudulent inducement include "statements of fact" that are "false and material"). The misrepresentation must involve an affirmative false statement or concealment by word or conduct that amounts to the equivalent of a false representation. *Lambert v. Downtown Garage, Inc.*, 553 S.E.2d 714, 717 (Va. 2001).

Morgan's negligent/intentional misrepresentation and fraudulent inducement claims fail because Morgan has shown no misrepresentation by IRI. Morgan maintains that IRI made misrepresentations through Roberts when he and Morgan discussed Morgan's potential retirement on July 18, 2019. (Response in Opp., Doc. 53, Pg. ID 4242.)

18

Morgan maintains that, during that conversation, Roberts "encouraged Morgan not to retire and told Morgan he would be taken care of," which were misrepresentations because Roberts planned to fire Morgan when he made those statements. (*Id.*) But Morgan cannot point to any evidence to show that Roberts intended to fire Morgan when he made those statements to Morgan on July 18, 2019.

Morgan points to two conversations that Roberts had with Jakobsen to show that Roberts had long-term intentions of firing Morgan. (Response in Opp., Doc. 53, Pg. ID 4239.) Morgan first points to Roberts' hand-made charts that he sent to Jakobsen to show intent (Response in Opp., Doc. 53, Pg. ID 4239), but these charts merely show that Roberts hoped to restructure NAPP's management. (*See* Organization Chart, Doc. 41, Pg. ID 3588-89.) These charts do not show that Roberts intended to fire Morgan. Morgan next points to Roberts' conversations with Jakobsen in May 2019 about a potential long-term role for Jakobsen at NAPP (Response in Opp., Doc. 53, Pg. ID 4239), but these conversations never reference the Managing Director role and simply discuss finding a permanent position for Jakobsen. (Jakobsen Dep., Doc. 36, Pg. ID 2556-57; Jakobsen Role Correspondence, Doc. 36-1 at Page ID 2751-2753.) Neither piece of evidence shows that Roberts intended to fire Morgan at the time of the July 18, 2019 conversation.

To be sure, the only instance where Roberts demonstrates some intention to terminate Morgan—prior to actually terminating him—was on August 28, 2019. (*See* Roberts Dep., Doc. 35, Pg. ID 2414.) On this date, Roberts corresponded with the company's legal department about firing Morgan. (*Id.*) This conversation, of course, occurred after Morgan and Roberts' July 18, 2019 conversation.

19

Accordingly, Morgan cannot show that Roberts intended to fire Morgan during the July 18, 2019 conversation. In turn, Morgan cannot establish that Roberts' statements were misrepresentations about Morgan's job security. Morgan does not present any other argument to show that IRI made misrepresentations to Morgan. As Morgan cannot show by clear and convincing evidence that Roberts or IRI made any misrepresentations to Morgan, his intentional/negligent misrepresentation and fraudulent inducement claims fail. Thus, summary judgment must be entered in favor of IRI on these claims.

## CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant Interstate Resources, Inc.'s Motion for Summary Judgment (Doc. 45) and **TERMINATES** this matter from its docket.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND